NEW YORK GRAPE SUGAR CO. *v.* AMERICAN GRAPE SUGAR CO. *et al.*

SAME *v.* BUFFALO GRAPE SUGAR CO. *et al.*

(*Circuit Court, N. D. New York.* June 8, 1888.)

PATENTS FOR INVENTIONS — PRIOR USE — REHEARING — SUPPRESSION OF TESTI-
MONY — CREDIT OF WITNESSES.

    N., the owner of letters patent No. 65,664, of June 11, 1867, to Joshua J. Gil-
bert, for "manufacture of starch," sued G. for infringement. Pending suit G.
procured strong affidavits from Gilbert's employes that the process covered by
the patent had been used in his factory for more than two years before his
application on March 11, 1867. These affidavits being submitted to N., he be-
came alarmed, and agreed, in consideration of their surrender to him, to se-
cretly abandon the suit, which was done. He also retained the attorney who
procured the affidavits. A., whom he had previously sued for infringement
of the same patent, and had obtained a decree against, upon discovery of
these transactions, moved for a rehearing on the ground of newly-discovered
evidence as to public use for more than two years, and suppression of testi-
mony upon that point by N. The testimony offered in support of the motion
was all that of Gilbert's employes. Some of it was unimportant, and not new;
and the most material part was that of Gilbert's foreman, who, at various
times during the several suits, had made five affidavits as to such public use,
two being entirely antagonistic to the other three, and the contradiction be-
ing unexplained. In addition, other affidivits excited serious distrust of their
accuracy. *Held,* that although the conduct of N. was reprehensible, the re-
hearing should be denied; the testimony offered being untrustworthy

In Equity. On petition for rehearing.
*John R. Bennett* and *Sherman S. Rogers,* for the petition.
*Edward N. Dickerson,* contra.

SHIPMAN, J. These are petitions by the defendants for a rehearing of the
above-entitled causes upon the ground of newly-discovered evidence, or evi-
dence the knowledge of which had been withheld by the act of the plaintiff,
upon the question of the public use of the invention covered by letters pat-
ent No. 65,664,[1] by J. J. Gilbert, the inventor and patentee, for more than
two years before the date of his application for the patent, which was about
March,[2] 1867. The opinions in the cases are contained in 18 Fed. Rep.
638, 20 Fed. Rep. 505, and 24 Fed. Rep. 604.[3] The bills in these cases
were filed October 14, 1881. The defendants' testimony was closed No-
vember 14, 1882. The plaintiff's rebutting testimony was closed April
3, 1883. In June, 1883, a petition was brought by the defendants for
leave to introduce additional and newly-discovered evidence in support
of two of their defenses. A part of the new evidence was the testimony
of John A. Owens, Daniel Murphy, Thomas Cavanagh, and John L.
Palmer, that the process had been used in the J. J. Gilbert factory for
several years before the application, and before 1865. These four per
sons are a part of the witnesses whom the defendants desire should testify
upon the rehearing. This petition was heard by Judge WALLACE and
was denied. Shortly after, the case was heard by me upon final hear-

[1] Issued June 11, 1867.     [2] March 11.     [3] See, also, 10 Fed. Rep. 835.

ing, was decided on November 20, 1883, and an accounting was ordered from and after October 13, 1881. Subsequently a motion was made by the plaintiffs to amend the interlocutory decree, so that an accounting should be directed as to profits which were received, and damages which were inflicted by the infringers before October 13, 1881, which motion was denied on July 23, 1885. When the motion was argued, the defendants had been orally informed of the abandonment of the suit of the plaintiff against the Duryeas, which will hereafter be spoken of, and the reasons for said abandonment or settlement, and endeavored to show, from this information, that there was evidence in existence which would justify or call for a rehearing; but as they had no affidavits from persons who had personal knowledge on the subject, their efforts to make their information effective were of no avail. Wright Duryea and John Duryea, two of the Messrs. Duryea, the principal stockholders in the Glen Cove Manufacturing Company, of Glen Cove, Long Island, were witnesses for the defendants in these two cases, and were very sharply criticised by the plaintiff's counsel. In December, 1883, a temporary injunction against the use by the Glen Cove Manufacturing Company of the process patent was obtained at the suit of the plaintiff. A suit against John Duryea and Wright Duryea, for conspiracy, was commenced by the plaintiff in one of the courts of the state of New York, and a prosecution against John Duryea, for perjury in these cases, was commenced before a United States commissioner. Upon the hearing this complaint was dismissed by the commissioner. In the preparation of that portion of their defense in the patent suit which related to the public use by J. J. Gilbert before his application for a patent, the Duryeas employed Simon D. Phelps, Esq., a lawyer of New York, who obtained the assistance of K. E. Morgan, Esq., a lawyer of Little Falls, and John A. Owens. Affidavits were given in May, 1884, by 12 of the former employes of J. J. Gilbert, including an affidavit by Owens, for the purpose of showing that the patented process had been used by said Gilbert before 1865. These affidavits were very satisfactory to said Phelps and Morgan, who considered that the defense of public use was conclusively established thereby, and were taken to New York city, and, said Morgan having brought about an interview between the president of the plaintiff company and Mr. Phelps, they were taken to the office of Messrs. Dickerson, counsel for the plaintiff, and were read in the hearing of Mr. Dickerson, Jr., and other representatives of the plaintiff, by Mr. Phelps, for the purpose of inducing the plaintiff to abandon its suit against the Glen Cove Company. Mr. Dickerson, Jr., advised the directors of the plaintiff company that the affidavits were not, in his opinion, an effectual defense. The directors voted not to discontinue. Shortly after, an interview was had between the executive committee of the directors and Messrs. Wright and Hiram Duryea, which resulted in an agreement for the settlement and abandonment of the said suit, and in the subsequent delivery of said affidavits to the vice-president of the plaintiff, all which was not communicated to their counsel. A written agreement between the two companies, dated May 16, 1884, was executed, by which the

plaintiff released the Glen Cove Company and its officers from all claims for damages or profits by reason of any past or future infringement of said patent, and agreed to discontinue said suit, and that it should have the right to use said process. On May 22, 1884, the plaintiff made a written agreement with said K. E. Morgan, by which, in consideration of his legal and other services to be rendered in its suits previously or thereafter commenced upon the Gilbert patents, it agreed to pay him 5 per cent. upon all gross sums received from any person as damages or profits by reason of the infringements of said patents, except from the present defendants and the St. Joseph Refinery. Said Morgan agreed to aid and assist the plaintiff in and about said actions, but he was not to take part in the trial thereof, or aid in their preparation, outside of Herkimer county, except as to evidence connected with the Gilbert factory in New York state. He was also paid a retainer of $250. The gentlemen connected with the plaintiff place the agreement with the Duryeas upon the ground that they were to assist them, before the master in the present cases, with testimony and evidence respecting the value of the Gilbert process, and were also to use and develop the De Castro and Miller patented process for making starch, the patents for which the plaintiff had recently purchased for a large sum. The plaintiff has not yet built or purchased a machine, as it was intending to do, and the Duryeas have not built the factory in which the process was to be used, if it proved satisfactory after experiments at Glen Cove. At the interview between the executive committee and the Duryeas, these were the considerations which were pressed for an abandonment of the suits and a license to use the Gilbert process, and the suppression of evidence was not probably alluded to in the discussion; but the fact, which cannot be concealed, was that the officers of the plaintiff were intimidated by these affidavits, and feared their publicity, and wanted that the testimony should not be bruited about, and that the lips of the affiants should be closed, and were willing to abandon the hope of the very large sums which they had expected to gain from the Duryeas' use of the Gilbert process, and make with them a secret treaty, which they did not tell their counsel. The agreement with Morgan was also for the purpose of keeping this testimony quiet, and the affiants in their control. No stipulation for discontinuance of the patent suit was then asked for or executed. It was first asked for and obtained on April 18, 1885, and was filed in court on November 12, 1886, and the suit was discontinued on the same day. Phelps told the defendants' counsel about April 10, 1885, of this settlement, so far as it had then taken place, but would not give an affidavit. Subsequently the defendants made efforts to obtain information from Morgan, at Little Falls, but were foiled, until he ceased his connection with the plaintiff, and entered the employment of the defendant, about May, 1886, when the business of affidavit making was resumed; and the affidavits of the various affiants, which were used upon this hearing, were sworn to in September and October, 1886. The petition was brought in February, 1887, but by successive agreements of counsel for various reasons, the hearing was postponed till March, 1888.

The affidavits, which Morgan's abandonment of his relations with the plaintiff permitted to be taken, and which relate to the use of the Gilbert process at Little Falls, are of James Bennett, Welford C. Casler, Thomas Cavanagh, Michael Davin, Peter Dunn, John Haley, Patrick Kiefe, James Mathews, James McGurty, Daniel Murphy, John O'Brien, John A. Owens, and John L. Palmer. The affidavits of Casler and Dunn are unimportant, and those of Haley and Mathews are not valuable. Palmer's affidavit is somewhat vague as to dates, but its value, whatever it is, is impaired by his affidavit of April 27, 1881, in which he says that Gilbert was experimenting until about a year and a half before the date of the patent, at which time his invention was perfected. The plaintiffs' case upon final hearing was that Gilbert experimented for a number of years in regard to the sweet process. At first he "alkalied" the unground corn with alkaline liquor, prepared from soda ash and lime, in a tank upon the third story of his mill, which stood near the tub in which the corn was soaked. He abandoned that method, and for a time "alkalied" the entire contents of the settling vat upon the first story, before the supernatant water was drawn off. Then, having substituted for the square vats which he had previously used, round vats, with mechanical agitators to stir up the starchy mass after the alkaline liquor had been added, instead of stirring by hand, he applied the alkali only to the pasty mass in the tub after the superfluous water had been drawn off. The construction of the round tubs and their agitators, in the summer of 1865, mark, according to the plaintiffs' theory, the time of the invention of the process which is disclosed in the patent. Upon final hearing, the defendants having introduced only one witness, Spohn, whose testimony was of consequence in regard to previous public use, the plaintiff proved its case by two workmen in the starch factory, the carpenter who made the tubs, and a man who gave the proper dimensions of the tubs to the carpenter. The object of the affidavits is twofold—*First*, to show that continuously, from and after the introduction of the sweet process into the mill, the alkaline liquor was placed in the settling vats, and that this process was carried on, without break, for a long period before 1865; and, *secondly*, that the substitution of the round tubs for the square tubs was without significance, and, if it was, it occurred in 1863 or 1864, instead of in 1865. Owens gives a very long and carefully prepared affidavit, in which he narrates the history of the sweet process, and of the mechanical changes in the factory, and says that what was always called the "sweet process" was practiced therein from 1857 or 1858 to 1866, and that by the process the caustic liquor, which was prepared in the tank on the upper floor, flowed through pipes into the settling vats on the first floor. Without positively declaring in this affidavit that the unground corn was never alkalied, he wishes to have it understood that the "sweet process," as now known, was continuously practiced, in its important and leading features, in the ordinary and usual manufacture of starch, from and after 1858. The case upon this petition rests, in a great measure, upon Owens, who was the foreman or superintendent of J. J. Gilbert during all the time which is in controversy; who is an in-

telligent man; is the inventor of one of the patents which are the subject of the suits; who had the opportunity of knowing, and the capacity for remembering, the exact truth in regard to the matter of Gilbert's manufacture; who is, in my opinion, the real author of the memory of most of the other affiants, not including O'Brien and Palmer; and who has himself given five affidavits on the subject, which are in evidence. It is said that he has also given one more. On May 3, 1881, he gave an affidavit in which he said that at first a system was tried of soaking the entire grain in alkali, consisting of lime and soda ash, which was repeatedly tried at intervals until the year 1865, when it was finally given up. Thåt several other methods were tried, among which was "alkaliing" the entire mass of starch as it came from the sieve, but this worked imperfectly; and he knew that the improvements in patent No. 65,664 were made by Gilbert, and completed in his factory about 18 months before the date thereof, and that none of these were in public use or on sale for more than two years before the date of the patent. On October 21, 1881, he made another affidavit, in which he testified that in 1868 he went himself into the manufacture of starch, and used the Gilbert improvements without knowing that they were secured by letters patent; that Gilbert sued him for the infringement of No. 65,664; that he then examined the patent, and, "being satisfied that Gilbert was the first inventor of the improvements, and that they were of great value, and indispensable in the manufacture of starch from corn, discontinued their use and the manufacure of starch, and went into another business. His third affidavit was for use upon the hearing before Judge WALLACE, in which he says that the caustic alkaline liquor was not ﬠpplied in Gilbert's factory, before grinding; that the statements contained in the depositions of the plaintiff's witnesses that alkali was used on the corn before grinding, are entirely erroneous; and that the process, as described in the patent, was used for several years in the factory before March 11, 1865. In no one of the last three affidavits does he explain why he made the totally contradictory statements which I have quoted, or give any reason for the change in his recollections. He does not apparently attempt to excuse or mitigate the disgrace of being a willful perjurer. Nothing that this man can say upon the history of this process will now have the slightest effect upon my opinion. He has discredited himself so much by his falsehood, that, in this case, he is a complete blank. The affiants Bennett, Cavanagh, Davin, Kiefe, McGurty, Murphy, O'Brien, and Palmer, all reside in Little Falls, except O'Brien; and all except O'Brien and Palmer were apparently common laborers, and persons of limited intelligence.

Before the testimony for final hearing was taken, Mr. Selden, one of defendants' counsel, visited Little Falls, and, as he says, "endeavored to find the employes who were in the J. J. Gilbert starch factory, at Little Falls, N. Y., from 1860 to 1867. I found a number of those parties." He found Owens and Cavanaugh, who were silent, and Palmer, who was communicative enough, and whom he subpœnaed, but did not ask to testify. He had and used abundant opportunities to hear about and see

all the Little Falls workmen, but it is manifest that his attempts at extracting information which would be favorable to his clients were unsuccessful. They were either ignorant, and could not tell him anything, or willful, and would not tell him. I think that Owens was then favorably disposed to the Jebbs, and that the workmen got the idea that the defendants' success meant injury to the starch factory which was then in operation, and they were intentionally silent; and furthermore, that their memory on the subject was confused and blurred. These witnesses were induced, subsequently, to remember and to talk. I distrust testimony thus obtained and given. It commands neither my confidence nor my respect.

Turning now to the contents of the affidavit, they fail to convince me that the alkaline liquor was not originally applied to the unground corn, for, if it was not, why was the tank in which the liquor was prepared placed in the third story, which involved the necessity of hoisting the hogsheads of soda ash, and the casks of lime into the third story,—a most unnecessary labor, if the present representations of Owens and the subordinate workmen are to be credited. If the liquor was applied to the unground corn, and that process was subsequently abandoned, the affidavits of these witnesses show a lack of memory which is not strange when the length of time which has elapsed since 1865 is considered, but which seriously impairs the value of their affirmative testimony. Again, in regard to the time when the round tubs were put in, the affiants show a confused state of memory. Owens, in his Duryea affidavit, fixes the time of putting up these tubs by certain entries in the day-book of William Dorr, as in January and February, 1863. In his present affidavit he says between the last of 1863 and the spring of 1864, "I should say about April, 1864." McGurty, in his Duryea affidavit, says that they were in the factory when he went there, in March, 1863. In his present affidavit they were built in the spring or summer of 1864. Murphy thought, in his Duryea affidavit, that they were put in about 1863. Now he testifies that they were built by Eddy and Dorr. The time he does not fix, but he left the factory February 1, 1864. Cavanagh, in his Duryea affidavit, thinks that the date was in 1863. Now he says, after 1862 or 1863. O'Brien, in his Duryea affidavit, thought that the time was in 1863. In his present affidavit, he says that it was before he left, which was in 1866 or 1867,—when he cannot tell. Bennett, in his Duryea affidavit, thinks that the date was in 1863. He does not attempt to fix the time in his present affidavit. Davin testified in his deposition that they were built in 1865. In his affidavit he says that he made a mistake, and it was in 1864. I have looked at these affidavits with more attention, because the case is not placed by the petitioners solely upon the ground of newly-discovered evidence. In view of the knowledge of Mr. Selden of the names and places of residence of the Gilbert workmen, and of the fact that the testimony which some of the important witnesses would give was known before the final hearing, and that application was made to take their testimony, and was denied, it can hardly be said that it was newly-discovered evidence. But the

petition is also placed upon the ground that there was, on the part of the plaintiff and the Messrs. Jebb, a fraudulent concealment and suppression of this testimony from the very beginning, which taints the case, and renders it important that there should be a new hearing. Upon this account I have thought it best to look with some care into the character of the testimony, and see whether its nature is such as to furnish any reliable information in regard to the history of the patented process; for, although the suggestions of the defendants may be correct, if the testimony is of so poor a character as not to affect the mind favorably, it is useless to grant a rehearing. It is true that I view with great dislike the final course of the plaintiff in regard to the Phelps-Morgan affidavits, the abandonment of the Duryea suit, and the employment of Morgan. The conduct of the plaintiff in this respect has been such as to arouse a desire that there should be a new and full hearing. If I had confidence in the trustworthiness of the testimony I should be inclined to have the question again tried. But whatever Owens may say is entirely untrustworthy. The other witnesses, not including O'Brien, Palmer, and Davin, who was a witness for the plaintiff, and who now seeks to correct his testimony, had abundant opportunity to tell Mr. Selden what they knew, if they knew anything, before the hearing; but nothing favorable could be elicited from them until the key was applied by Owens or Morgan. Assuming that the plaintiff has acted all the way improperly, and with a just dissatisfaction at its conduct in the matter of the Duryea settlement, I have such a serious distrust of this testimony—which, I fear, has been, to a considerable extent, injected into the memory of the witnesses, though not by the defendants or any of their solicitors or counsel—that I cannot grant the petitions. The petitions are denied.